We're here for argument in Demetric King v. City of Sylvester Georgia and Raymond Drennan. Joshua Kyle Brooks is here for the Appellant King. Francis Clay is here for City of Sylvester Georgia. And Mr. Brooks, you may begin your argument. Mr. Brooks, my partner Ed Buckley, and I represent the plaintiff in the case of Mr. King. Mr. King is a career law enforcement officer. When Mr. Drennan was hired in August of 2018, Mr. King had worked for the City of Sylvester Police Department for about 21 years. He'd worked his way up from a low-level employee to being the captain of the department. He was second-in-command and one of only three people in the executive management staff of the department. Not long after Mr. Drennan was hired, Mr. King's career got turned on its head when he was abruptly demoted and terminated because of his race and because he violated the EEOC charge alleging race discrimination. How is Doug Brooks a valid competitor? Similarly situated, he was a white man who was not of the same rank, not under the same supervisor, and Drennan was not a part of the decision to discipline him. And King had numerous misconduct violations, whereas Brooks had just one. It's hard to say that he was a valid competitor, Brooks. Your Honor, I would make a couple of points on that issue. First, I think this case is best addressed through the convincing mosaic standard rather than the McDonnell-Douglas standard. That is not to say that it shouldn't be reversed under either. I think it should. Okay, so you're abandoning the race discrimination claim? No, not at all. We do assert race discrimination under both McDonnell-Douglas and convincing mosaic charges both ways throughout the district court and appellate court process. Okay. We contend that both the demotion and the termination were racially discriminatory, and also the termination was retaliatory under FMLA and Section 1981, Title VII. So does that mean you acknowledge if you don't have a valid comparator that your McDonnell-Douglas-based argument failed? You're just trying to move forward on convincing mosaic then? No, I'm not abandoning McDonnell-Douglas. I do think that Doug Brooks is a valid comparator. He was the third in command of the department. He was the lieutenant. He was immediately under Mr. King, and then the chief of police was the only person over the two of them. The reason that Doug Brooks didn't have a disciplinary record is because Mr. Drennan refused to discipline him. Drennan received repeated citizen complaints about Doug Brooks not doing his job and sitting and jawboning at the city's maintenance office, and he received a complaint from Mr. King that Mr. Brooks failed to respond to a violent crime that was in process because he was socializing at the city maintenance office instead of listening to his police radio. I'm sorry. Was Mr. King Brooks' direct supervisor or the other? At the time of that incident, Mr. King was Brooks' direct supervisor, but Drennan had supervisory authority over both of them, and from a practical standpoint, King was not in a position to bust Lieutenant Brooks down a rank or something of that nature without buy-in from the chief of police, who was the third member of that executive command staff. So you're saying there's evidence in the record showing that Mr. King did try to punish or otherwise respond to the complaints, and he didn't receive the support that he needed from other officers? He went to Chief Drennan and said, Chief, Lieutenant Brooks is over here socializing and not doing his job. He missed a call for a violent crime. I had to drop everything and go respond to it when I wasn't even supposed to be out of the office. He was supposed to be tending to administrative duties. And then I found him socializing afterwards and not monitoring his radio. Drennan acknowledged when Mr. King told him that, Drennan acknowledged that he had received repeated citizen complaints about Brooks not doing his job, but he failed to institute any sort of internal investigation of Brooks or even issue an oral reprimand or written reprimand, something as simple as that. He took no action to discipline Brooks. And that's what I'm just trying to clarify. Was it Drennan's responsibility, even though he's the overall supervisor, to punish Brooks as opposed to Mr. King, who was his direct supervisor? Yes. Our position is that Drennan had both the ability and the autonomy to respond to Brooks in those instances, and he just failed to act. But Mr. King did not fail to act by not punishing Brooks, even though he was his direct supervisor. And I'm just asking because if we're going to put any emphasis on Drennan's failure to respond to Mr. Brooks' bad act, I'm just trying to clarify what Mr. King's role in that process was or should have been. If I understand your question correctly, Judge, yes, Mr. King did not fail to act. He, in fact, did act. He tried to prompt Drennan to take corrective action against Brooks. Drennan just simply refused to do it. Of course, Brooks is a white man, and there's evidence throughout the record regarding race discrimination against Mr. King by Drennan. I guess I have like a more basic question. Excuse me. I know we've talked about similarly situated comparators, and they don't have to be exactly, but they do have to be somewhat close. And I wonder, even though I can understand why you might argue that Brooks was a comparator here, it seems like, at least as I understand the record and maybe I misunderstand, that the problem that was, I guess, pointed out for Mr. King was not that he failed to respond to a call, as Mr. King alleges that Mr. Brooks did, but rather that he was sitting on a street in the sort of wee hours of the morning for two and a half hours loudly playing music in the neighborhood. I know that your client has said he was not doing that, that he was sitting there, but he was reading the Bible and he was listening to gospel music and it wasn't loud. But there's also this investigation that Officer White conducted, and based on that investigation, I guess the chief found that your client had, in fact, engaged in playing loud music in the area. And so it seems like maybe it's not exactly the same, or it doesn't have to be exactly the same, but maybe it's not close enough conduct for the two to be comparators. Can you just address that for me, please? Yes, Judge. If I understand your question correctly, I think the conduct, alleged conduct, in its most basic form, supposedly just sitting by and failing to do their job is relatively similar. I think Lieutenant Brooks' alleged conduct is actually much more severe, even if you accept the defendant's proposition, which is contested, and there's a genuine issue of material fact on this. So maybe that goes to convincing Mosaic, but why does it go to similar conduct by a similarly situated comparator? Why isn't that apples to oranges if, by your own view of the evidence, it's much worse conduct? Why isn't it different? I'm not sure that I fully understand the question. I think in this situation we have Lieutenant Brooks engaging in more severe misconduct, and Mr. King's presented evidence saying that he was not engaged in any misconduct whatsoever. He was doing his job during that entire time. He was actively listening to the radio, monitoring for calls. Right, and that's really my point, right? The misconduct that Mr. Brooks engaged in was not doing his job. He skipped a call. There's no allegation that Mr. King skipped a call. The allegation there is that he was playing really loud music on a street in a neighborhood between the hours of, like, 2.30 and 5 in the morning, right? I mean, that's what the allegation is. So why is that similar conduct that we should use as a comparator? Maybe it doesn't matter because even if it's not, you're arguing it under convincing mosaic as well. That's exactly what I was about to say, Judge. I think it's enough to get us there under McDonnell-Douglas, but even if the court finds that it's not, it's certainly relevant for a jury to consider in the convincing mosaic analysis. As the court recently held in Times, the strength of a plaintiff's comparator evidence is relevant to the ultimate question of discrimination, even if the plaintiff cannot satisfy the comparator managing McDonnell-Douglas. And it is for the jury to determine how much weight to give comparator evidence. Well, of course, the city of Sylvester, Georgia, when they get up here, I'm sure they're going to say that there was more involved than just playing, blaring loud music. I'm sure that they will, Judge, but we have submitted evidence, including an affidavit, that directly contests their version of what occurred on that night. We have submitted evidence showing that the people who were interviewed, I mean, the person interviewed, we got a drunk Facebook post. We got the witness who made that Facebook post contradicting himself, backtracking off of his story. One of the witnesses who was apparently claimed to have seen our client's vehicle could offer nothing more than, hey, I saw it, it was dark, I couldn't see who was inside, and the headlights were pointed at us. And the third one's a convicted drug dealer and felon, and the investigating officer knew that, had personally participated in one of his arrests, and failed to document that in her report about it. She was also admitted in her deposition that she repeatedly used the N-word to refer to black people. She had a finding against her in her personnel file for using that word inappropriately in the workplace. She admitted in her deposition that she improperly lied to our client during the course of the investigation and that that was against the rules. And she admitted in her deposition that her report on her, quote, investigation was replete with factual errors. I mean, on the record in this case, we've got evidence of race discrimination from beginning to end. We've got evidence of Drennan patting Mr. King's personnel file and admitting in his deposition that he was doing it because Mr. King filed an EEOC charge. All right, well, what we have are we've got Drennan use some racial slurs in the workplace on at least two occasions. He referred to an immigrant as an illegal, and he used the N-word to slur a white person, although it was not in connection with King's case. Do we have anything other than that to support the convincing mosaic? We do, Your Honor. From the outset, Drennan was hired specifically because of his race, and the city manager told Chief Washington that he was getting him a white man because he didn't believe that the police officers were listening to the black man's staff. As soon as he got in the office, Drennan undertook a restructuring that he used to eliminate 75 percent of the minority supervisors in the department. Well, one of those, though, I mean, was there some kind of a criminal charge or something or domestic battery? There was. So how can we include that? I can see that there was nothing wrong with the fact that he was fired for beating his wife while he was on duty. Absolutely, he should have been, but it still helped Drennan achieve his goal of reducing minority leadership, whether there was some independent reason to do it or not. The other thing, and the district court missed this, and I think it's important that the court hear, is that when he reorganized the department, Drennan put a boatload of duties onto our client that made it impossible for him to fully perform all of his duties, and he did it specifically by removing those duties from two white officers and making their loads lighter. And we put evidence in the record about that, and it's not reflected in the court's order below. Okay. We also have a case, Rojas v. Florida, where we said that, you know, if there's isolated, unrelated racial comments that can't be used to support a convincing mosaic, all you have here are really two isolated occasions, one referring to an immigrant as an illegal, and then the N-word used once to slur a white person. I've reserved some time for rebuttal, Your Honor. You can answer the question. Yes, there are some instances where he called someone illegal and admitted that he did it because he assumed, based on his racial heritage, that he didn't have legal status. And he used the N-word in front of three black subordinates in the workplace. And my response to that is these aren't isolated incidents. There's a pattern of him engaging in race-based conduct with respect to the restructuring and targeting Mr. King for demotion and termination. There's a pattern of him listening to these incredible white witnesses who had a motive to try and get Mr. King away from their house and completely disregarding Mr. King's credible testimony that he did nothing wrong. And in this day and age, for someone to use language like that in the workplace, it's unfathomable to me, and I think it would be to a rational jury, that that is not evidence of his complete disregard for people of color or the way that his language affects them and is not evidence of a racial animus on his part. And my question to you, although I know your time is up, but let's say Mr. Drennan is a racist. But how do you, I guess, combine that with the fact that the record shows that Mr. King's disciplinary record does seem to be supported by the facts underlying the discipline? How do we reconcile that? You have a person who's in charge of the department who might be very well a racist, but you have someone else, an African-American man, who's engaging in acts that also merit discipline. How do we weigh those two? I think that the point here is that the record does not actually demonstrate that he engaged in this misconduct. With respect to his demotion from Drennan, we submitted deposition testimony documents and an affidavit from Mr. King directly rebutting every reason that Drennan claimed he was demoting Mr. King for. We also directly rebutted the reasons that Drennan claimed he was firing King for. And mixed in with this, in the termination claim, is the fact that when Mr. King filed an EEOC charge, Drennan went and dug up additional things to pad his personnel file with new allegations of things that he supposedly did wrong months before specifically to set him up for future discipline. And he admitted in his deposition that he was doing that because King filed an EEOC charge. Was the EEOC charge in his personnel file when Drennan decided to terminate? I don't know, Your Honor, whether or not it was specifically in the personnel file, but Drennan admitted during the deposition that he knew about it. And there's an email. It's at document. Drennan says in his deposition that he knew about the EEOC charge when he decided to terminate? Yes, and specifically he sent an email the day before Mr. King allegedly had this incident that these citizens made the Facebook post about that says, additional documentation on EEOC complaint by Demetrius King that he was sending to the personnel file specifically. All right. Well, you'll keep your rebuttal time, and we'll hear from Ms. Clay. Thank you, Your Honor. May it please the Court. My name is Frances Clay, and I'm terrible with a microphone, so I apologize in advance. But I am here representing the City of Sylvester and Raymond Drennan in this appeal. There are lots of questions that you all have asked that I would like to address, if I could do that before actually starting my argument. One of those is, and this is what Mr. Brooks just brought up, about the padding, the employment file. Defendant Drennan did know about the EEOC charge because we had to write a position statement. And so we had asked him for the disciplinary file. And in going through that, yes, he wrote down additional information. Why doesn't that support the notion that there was enough here for a retaliation claim to survive? Because there was an intervening act of further misconduct by Mr. King. You know, Mr. King has an extensive disciplinary history. It's not just under Defendant Drennan. It was under prior police chiefs. It goes back to 2005 when he was caught sleeping behind a school, and he was written up for that. He was hanging out in the emergency room for hours when he shouldn't be doing that. He was talking on the phone for too long. But Mr. King says there were other people like Officer Brooks who were engaged in improper behavior, if not illegal behavior, who weren't punished. That he reported that information to Officer Drennan or Chief Drennan and didn't receive any response. And yet he is engaging in behavior that also is not appropriate, but as he claims, not as egregious, and he finds himself ultimately unemployed. Your Honor, if I may, this was in and out the day after he had been deposed and he was facing summary judgment, he put in this information. Yes, he did put that in. However, he still doesn't have any history of Lieutenant Brooks' personnel file. We have Mr. King's personnel file going back many years, multiple violations, multiple failures to supervise. Then we have Lieutenant Brooks, who is under Mr. King's supervision. Part of the complaint about Mr. or the complaint about Mr. King is his failure to supervise his officers. Rather than documenting anything about Lieutenant Brooks, writing him up, producing any evidence of any sort of reprimand for this behavior, instead he goes to Defendant Drennan expecting him to do the discipline, expecting somebody else to do the work for him. Like he expected somebody else to do the hiring duties for him. He tried to, you know, buy lunch for Lieutenant White or to pay her to do the hiring duties. Eventually the hiring duties were given back to her, all right? Even without the hiring duties, he still couldn't perform his duties. He did not approve reports. That was going on the entirety, and there were multiple emails on the record of Defendant Drennan saying, where are these reports? There are reports going back to June that haven't been approved yet. It's September, it's October. Where are these reports? There's a report from somebody at the SHIP Center. I think it's called the SHIP Center. There was vandalism there. That was in December. His hiring duties were given to Lieutenant White in either December or January. Yet he still failed to supervise his officers and failed to do what Defendant Drennan specifically asked him to do, which was to provide the 911 log every Monday showing that the officers had been patrolling the SHIP Center. So what is your response to Mr. King's argument that part of the reason why he was having problems with supervision is because his load was much heavier than other officers, particularly other white officers? Well, what he fails to acknowledge is that one of the reasons Lieutenant White's hiring duties were given to him is that the investigation division, which had four investigators in it, was reorganized so that she was the only investigator now. She was given sole responsibility over investigations, sole responsibility over professional conduct. She then ended up taking back the hiring duties when he couldn't perform them and complete all the background checks. And she still performed them all. But also, he's a hired rank. He's a captain. He should have more responsibilities than the lieutenants under him. He failed to supervise by implementing discipline. Maybe, or maybe he should just have different responsibilities. Maybe so, but these are the responsibilities that he had in a small police department. Everybody has to wear multiple hats and work as a team. Even so, even if he should have had more responsibilities, it doesn't mean you should have infinite responsibilities, right? I mean, there could be a limit about on what is reasonable. That is true, but the other officers had responsibilities as well. He wasn't responsible for investigations. He wasn't responsible for professional conduct. He wasn't responsible for some of the things that Doug Brooks was responsible for, one of which was taking all of the vehicles to the city shop. He was in charge of maintenance. He was supposed to wait there for the vehicles to be repaired and return them. Was there a performance improvement plan or any kind of plan put in place to help Mr. King get back on track? I'm not aware of a specific performance improvement plan, but multiple chiefs before Chief Drennan had recommended his demotion, his termination, you know, suspension, whatever. He knew he had problems with this. He knew that he, but Defendant Drennan would send him e-mails, not write him up, but send him e-mails and say, I need these reports. I need the 911 logs. I need to know that the officers are doing their job and sitting on Pinson Street. He didn't provide any of that, so he was. So Mr. King has raised the claim under McDonnell Douglas. I think there's some acknowledgment that that's a challenging, maybe weaker argument. But the convincing mosaic, especially with the use of epithets and it sounds like this environment, which was racially hostile, some might say, how do you address that through the lens of convincing mosaic? I don't think that it was a convincing, that it was a hostile environment, and I don't think there's evidence of that. When Drennan was accused of using the N-word, which, of course, he denies, the three black women confronted him and they said, did you say this about this white kid who was saying that he played basketball? And he said, no, you must have misunderstood me. He said, I'm sorry, you know. Those same women said that it was out of character for Drennan to say anything like that. That's why they couldn't believe that he had said it. And they also said that they had never seen him discriminate against anyone. And these were black women who heard this word. There was the illegal word, which, you know, somebody was going to an immigration hearing for her brother who was Hispanic. It was a wrong thing to say. But it was once, not in the presence of Mr. King. It wasn't directed at an employee or anything like that. Those are the only two little things they have. As far as the reorganization of the department, when Drennan reorganized the department, there was one Hispanic officer who was a sergeant. There were too many sergeants. She had less experience, less training in the particular area where she was going to work, less time with the city. She was demoted. The record evidence is that he even asked that her pay not be reduced because it wasn't a disciplinary demotion. It was just a reorganization. He left Planoff as a captain. He left Billings in his supervisory role. He left Luna in his supervisory role. The only reason that Billings was terminated was that he committed domestic violence against his ex-wife while he was on duty. And then you have Planoff's disciplinary history. His failure to do his job ends up in his demotion. While he is out on FMLA leave, you know, he appeals his demotion. He files an EOC charge. Defendant Drennan is gathering the information about his disciplinary history. He finds that the school resource officers who were under his supervision have been late, one of them 55 out of 65 days, one of them 32 out of 68 days or something like that. He has done nothing. He has not written them up. He has not. He has done nothing to supervise that. He claims that, you know, he told his officers to patrol. Telling your officers to patrol is not supervising. Supervising is making sure they do it. Right? So he comes back from leave, and less than a week later, after being demoted for failing to supervise, he, a patrol supervisor, the sergeant, parks on a street in a dark area where there is no police presence required for over two and a half hours, listening to music, maybe reading his Bible, whatever he's doing, he's not patrolling. He's not supervising. Patrolling, working as a police officer is more than just reacting if there's a call. I mean, he could sit at the office and react to a call. If you're on patrol, you are supposed to patrol. You're supposed to have a police presence to deter crime. You might even catch crime happening. Why isn't sitting in a neighborhood police, why isn't that sort of a police presence? Because he's in an area that's not a crime area. If he wanted to sit in his police car and read his Bible, maybe he should have done it on Pinson Street, where they had reports of drug deals, and where Defendant Drennan had specifically requested a police presence. He said, you know, sit there and do your reports. Sit there and patrol. He goes to some dark area with his music so loud that it wakes the children up. You know, obviously it was not sustained that he was engaged in sexual misconduct, and it wasn't even certain that there were women in the car. But that wasn't what his termination was based on. His termination was based on he's been demoted for his failure to supervise, and one week after returning to work, here he is shirking his responsibilities again. I mean, it showed such poor judgment. And, you know, he wanted to be a captain. Well, if you want to be a captain, you've got to do the work. You can't go to Defendant Drennan and expect him to discipline your officers. You can't say, well, I told them to do it. You've got to make sure they do it. If you want the rank, you have to do the work. He didn't want to, or didn't want to. He didn't. Like, I mean, in fairness, if he talked to the chief, and the chief didn't give him any support on supervising his officers or Brooks or whoever the case may be, I mean, doesn't that, it sort of seems like asking a lot to have a second-in-line supervisor supervise a third-in-line supervisor, I guess, when the first-in-line doesn't give any support for it. That is according to Mr. King's rather self-serving declaration that he submitted late in the game. But we have to accept it as true. We accept it as true. Even so, he doesn't, yes, he probably did not fire Mr. Brooks on his own. No. Maybe he couldn't even launch an investigation, but he could counsel him. He could write it up. He could do something, you know, and document it in the file and then say, hey, look, you know, I documented it. Look, I did supervise my officer. No, there's nothing there. He didn't do anything. All he did was go to Defendant Drennan and say, hey, guess what he did. But Drennan could have done all the things that you just described. Is there any prohibition against that? There is no prohibition against that. Drennan could have done that, you know, if he really had his information. He could have done that. And he did. But it also fell on King, too, for some responsibility. But ultimately, isn't it Drennan, even as King's supervisor, to make sure that King's people are acting in line and comporting? Right. Even though you have an intermediary supervisor, Drennan wanted to make sure his supervisors were doing their job supervising. Obviously, he wasn't. Could it have been handled in a different way? Yes, it could have. But it's not in evidence of race discrimination. It's not evidence of retaliation. You have someone who has a long history of not doing his job. Under your own supervision, he fails to do his job. He doesn't complete reports. He doesn't provide the 911 logs. He doesn't patrol Pinson Street. You demote him. So, I mean, he's on notice. You know, you're not doing your job. You've got to supervise. He comes back to work within a week. He parks in some remote area for two and a half hours, not patrolling, not doing his job. That is not a supervisor. This court has said repeatedly that it does not sit as a super personnel board or director just, you know, evaluating employment decisions. You can fire an employee for a good reason, a bad reason, a reason based on erroneous facts, for no reason at all, so long as it's not discriminatory. The evidence here is replete with reasons to fire him for his poor job performance. There is no evidence that it was done because of his race or because he filed an EEOC claim or because he filed an FMLA claim. But just to be clear, so Mr. King was on the force for about 20 years, though. Yes. And so for 20 years, you're saying that there was all this misconduct happening, but when Defendant Drennan gets on the scene? No. Other police chiefs had recommended him for termination and for demotion. But he was never terminated. I don't know why. Drennan wasn't there at that time. But when Drennan gets there, he's terminated. Well, also, you know, they say that this is going to be a white guy. We're going to get you a white guy. That was Atron Hayes. He left. When Drennan was there, Atron Hayes was not there, because he left in, like, May of 2018 or something, all right? But whoever Mr. King had who was friends on city council or whatever, I don't know. For some reason, they didn't come through for him on this one. But other police chiefs who were black said the same thing. They said he needs to be demoted. He is not doing his job. One, I think, got reversed because there was some procedural flaw of the timing of something. But for whatever reason, he kept hanging on to his job, and they kept putting him back up. But when Drennan came and he said, you know, I'm running the ship, and you're not doing this, this, and this, and you're a supervisor, and you're supposed to do this, and he didn't do it. So I think it was a legitimate non-discriminatory reason for his termination, and the district court should be affirmed. All right. Thank you, Ms. Clay. Mr. Brooks, you've reserved some time for rebuttal. Thank you, Your Honor. Judge Newsom, in his concurring opinion in times that was decided last December, made what I think is an important observation here. Satisfying the test, the convincing mosaic test, requires neither convincing a court nor presenting enough evidence to compose a mosaic summary judgment terms on the existence of genuine factual dispute. Courts deciding summary judgments don't weigh the evidence, and they don't decide, let alone announce, whether they're convinced. And a mosaic, in its truest sense, isn't necessary to defeat summary judgment. A single item of evidence can theoretically suffice. The court adopted, essentially, that position in its recent finding in Berry. And as Judge Rosenbaum properly observed a moment ago, the court's obliged to construe all fact inferences in favor of the appellant here as the non-movement on summary judgment. All reasonable fact inferences, not all fact inferences. The argument a moment ago made much ado about Mr. King's prior disciplinary history and the fact that people had recommended him for demotion or termination. What was blatantly absent from that discussion is the fact that King presented evidence to the district court below talking about the reasons that those were overturned. He was recommended for disciplinary action for supposedly failing to supervise an employee who allegedly engaged in some form of misconduct that he was neither observed or was later told about. He just got slapped with a disciplinary action. That got overturned. Atron Hayes, the city manager, forced Chief Washington to demote him, and he appealed, and that got overturned. And most importantly, Drennan knew about all of this, and this is in the record from Mr. King's affidavit, because shortly after Drennan became Chief of Police, Mr. King sat down with him and went through every disciplinary action that had ever been leveled against him, what had happened, why, and why it was overturned. So Mr. King had knowledge of the reasons that those things were overturned. Secondly, there was argument about Mr. King allegedly failing to complete reports or failing to have his officers patrol Penson Street or places like that, the SHIP Center. We presented evidence through Mr. King's affidavit that directly contradicts every single one of those allegations. They are disputed material facts for trial, and the jury should get to decide them. On the record before this court, if this is not a convincing mosaic of race discrimination or retaliation, frankly, I don't know what possibly could be. If the court has any further questions, I'm happy to answer them. But otherwise, for those reasons, we suggest that the court end the jury trial. We have your argument, Mr. Brooks. Thank you. Thank you.